998 F.2d 377
 41 Soc.Sec.Rep.Ser. 503, Medicare & Medicaid Guide
P 41,526
AMERICAN ACADEMY OF OPHTHALMOLOGY, INC.; the Cleveland
Ophthalmological Society, Plaintiffs-Appellants,
Academy of Medicine of Cleveland, Plaintiff-Intervenor-Appellant,
v.
Louis SULLIVAN, M.D., Secretary, United States Department of
Health and Human Services; and Gail R. Wilensky, Ph.D.,
Administrator, Health Care Financing Administration, United
States Department of Health and Human Services, Defendants-Appellees.
 No. 92-3706.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 3, 1993.
Decided July 9, 1993.
Rehearing and Suggestion for Rehearing En Banc Denied Aug. 24, 1993.
 
 Walter J. Rekstis, III, Lisa R. Battaglia, Squire, Sanders & Dempsey, Cleveland, OH, James H. Curtin (briefed), James B. Lynch (argued & briefed), Dorsey & Whitney, Minneapolis, MN, for plaintiffs-appellants.
 Michael Anne Johnson, Asst. U.S. Atty., Cleveland, OH, Robert M. Loeb (argued & briefed), Barbara C. Biddle, U.S. Dept. of Justice, Appellate Staff, Civil Div., Washington, DC, Elaine Romberg, U.S. Dept. of Justice, Civil Div. Federal Programs Branch, Washington, DC, for defendants-appellees.
 Before: KENNEDY and SILER, Circuit Judges, and CONTIE, Senior Circuit Judge.
 CONTIE, Senior Circuit Judge.
 
 
 1
 The American Academy of Ophthalmology, Inc., The Cleveland Ophthalmological Society, and (intervenor) Academy of Medicine of Cleveland initiated this action seeking to enjoin the Department of Health and Human Services from conducting the "Medicare Cataract Surgery Alternate Payment Demonstration," a demonstration project designed to test an alternative method of paying for outpatient cataract surgery and related treatments. The plaintiffs-appellants contend that the demonstration project exceeds the Secretary's statutory authority and violates their constitutional rights to equal protection. Upon cross-motions for summary judgment, the district court rejected the plaintiffs-appellants' arguments and granted summary judgment to the government. We affirm the district court's Opinion and Order for the following reasons.
 
 I.
 
 2
 In 1965, Congress enacted the "Federal Health Insurance for the Aged and Disabled" program, more commonly known as the Medicare Act. The Medicare program consists of two parts. Part A covers services furnished by hospitals and other institutional providers. 42 U.S.C. §§ 1395c-1395i-4. Part B provides supplemental medical insurance benefits for certain medical and health care services, including physician services. 42 U.S.C. §§ 1395j-1395w-4. Part B is administered through contracts with certain insurance companies who serve as local carriers. Part B covers eligible persons who voluntarily enroll and agree to pay monthly premiums. 42 U.S.C. § 1395j. These premiums, together with federal government contributions, provide the fund for the payment of benefits. The Medicare Act is administered at the direction of the Secretary of Health and Human Services ("HHS"). The component of HHS that is primarily responsible for administering the Medicare program is the Health Care Financing Administration ("HCFA").
 
 
 3
 Prior to 1992, reimbursement for physician services to Medicare beneficiaries under Part B was based entirely on the "reasonable charge" for such services. 42 U.S.C. § 1395u. The reasonable charge was defined as the lowest of the actual charge, the physician's customary charge for the service, or the prevailing charge for the service in the community, subject to limitations on annual increases determined by the Medicare economic index. 42 U.S.C. § 1395u(b)(3). Beginning in 1992, however, HHS and HCFA started to phase in a new system for payment of physician services based on a resource-based relative value scale, or fee schedule, instead of the "reasonable charge" method in use prior to 1992. 42 U.S.C. § 1395w-4. The fee schedule is based on the government's evaluation of the resources a physician devotes to a particular service or procedure.
 
 
 4
 Physicians have two options for receiving payment for the services they provide to Medicare beneficiaries. A physician may accept the beneficiary's assignment of Medicare benefits, in which case the physician agrees to accept the established Medicare fee schedule amount as full payment for all covered services provided to Medicare beneficiaries. Medicare, through the local carrier, directly pays the physician 80% of the fee schedule amount. The beneficiary is required to pay the remaining 20% (the coinsurance amount). Beneficiaries must also pay an annual deductible of $100.
 
 
 5
 Alternatively, a physician may decline to accept assignment. In such cases, Medicare pays 80% of the fee schedule amount, and the beneficiary pays the coinsurance amount plus any difference between the physician's charge and the fee schedule amount.
 
 
 6
 Physicians have two options when dealing with the Medicare program. A physician may become a "participating physician," in which case the physician agrees to accept assignment of Medicare benefits for all Part B services that the physician provides. 42 U.S.C. § 1395u(h). Alternatively, a physician may decline to become a "participating physician," in which case the physician may accept or decline the assignment of Medicare benefits on a case-by-case basis.
 
 
 7
 A cataract is a condition of the eye in which the eye's natural crystalline lens becomes clouded and impairs vision. In cataract surgery, the ophthalmologist removes the opacified portion of the lens and replaces it with a clear plastic intraocular lens ("IOL"). The care required for patients who undergo cataract surgery with IOL implantation varies. Many patients are able to undergo the surgery on an outpatient basis. Other patients, however, are at higher risk for complications and must undergo cataract surgery on an inpatient basis, or may require additional preoperative or postoperative care. Cataract surgeries are performed on Medicare beneficiaries more often than any other outpatient procedure, and a majority of the patients who undergo cataract surgery are Medicare beneficiaries. The HCFA estimated that in 1991 approximately one million cataract procedures were performed on Medicare beneficiaries at a cost of more than three billion dollars.
 
 
 8
 Under the Part B insurance payment scheme, HCFA pays for each item and service provided to a patient in connection with outpatient cataract surgery on a separate fee basis. In a typical cataract surgery episode, HCFA may separately pay for: a preoperative examination to determine the presence of the cataract; a comprehensive physical; presurgical diagnostic tests; a preoperative surgical evaluation; surgery (including separate payments for the services of the ophthalmologist and the anesthetist); pathology of the removed lens; the surgery center fee; final refraction of the patient's post-surgical vision; and, a long-term follow-up examination.
 
 
 9
 The Medicare Act ("Act") authorizes the Secretary of HHS to "develop and engage in experiments and demonstration projects," 42 U.S.C. § 1395b-1(a)(1),
 
 
 10
 to determine whether, and if so which, changes in methods of payment or reimbursement ..., including a change to methods based on negotiated rates, would have the effect of increasing the efficiency and economy of health services ... without adversely affecting the quality of such services.
 
 
 11
 42 U.S.C. § 1395b-1(a)(1)(A). Moreover, when conducting an experiment or demonstration project, the Secretary:
 
 
 12
 may waive compliance with the requirements of [the Medicare Act] ... insofar as such requirements relate to reimbursement or payment on the basis of reasonable cost, or (in the case of physicians) on the basis of reasonable charge, or to reimbursement or payment only for such services or items as may be specified in the experiment; and costs incurred in such experiment or demonstration project in excess of the costs which would otherwise be reimbursed or paid [under the Medicare Act] may be reimbursed or paid to the extent that such waiver applies to them (with such excess being borne by the Secretary).
 
 
 13
 42 U.S.C. § 1395b-1(b).
 
 
 14
 Recognizing the inefficiency of the current cataract surgery payment system, HCFA awarded a contract to a private consulting firm in 1989 to assist in the design and evaluation of a demonstration project to test the feasibility and effectiveness of an alternative pricing arrangement for cataract surgeries. In September 1990, HCFA proposed a demonstration project, the "Medicare Cataract Surgery Alternate Payment Demonstration," to examine the feasibility of paying for cataract surgeries and all related tests, services and examinations with one single negotiated fee.
 
 
 15
 On March 19, 1991, HHS and the HCFA announced that Cleveland, Ohio was chosen as one of three sites for the Cataract Demonstration. Participation in the demonstration is purely voluntary for both providers and beneficiaries. Ophthalmologists and facilities interested in becoming demonstration providers were required to submit a letter of interest and a completed pre-application form. Invitations to submit Final Applications for participation in the Cataract Demonstration were extended only to those providers who submitted the pre-application and letter of interest. Providers not participating in the demonstration will continue to operate under the ordinary Part B payment scheme, and beneficiaries will remain free to select the health care provider of their choice. Though the appellees anticipated that the three-year demonstration would begin January 1, 1992, the demonstration project has not yet begun.
 
 
 16
 Under the proposed demonstration project, HCFA would waive the present payment methodology applicable to the various services included in a typical cataract surgery episode for those participating in the project. HCFA and the participating facility would negotiate for a single "bundled" fee that would cover pre-operative tests and evaluations, surgery services (including the surgeon's and anesthesiologist's services, the intraocular lens, and the pathology of the removed lens), and post-operative examinations and final refraction. The negotiated fee would not cover diagnostic tests or exams to determine the need for surgery, the general physical exam and medical release necessary for surgery, inpatient cataract surgeries, or complicated out-patient surgeries.
 
 
 17
 On May 1, 1991, the American Academy of Ophthalmology ("American Academy") and the Cleveland Ophthalmological Society ("Cleveland Society") initiated this action against Louis Sullivan, M.D., Secretary of HHS, and Gail R. Wilensky, Ph.D., Administrator of HCFA (collectively the "appellees"), seeking declaratory and injunctive relief to prevent the Secretary from implementing the demonstration project. The plaintiffs-appellants alleged that the proposed demonstration project violates numerous provisions of the Medicare Act: § 1395b-1(b) (the demonstration project waiver provision); § 1320a-7b (the anti-fraud provision); § 1395a (the freedom of choice provision); and, § 1395 (prohibiting the Secretary from exercising control or supervision over the practice of medicine). Moreover, the plaintiffs-appellants alleged that the demonstration project violates their equal protection rights.
 
 
 18
 On June 10, 1992, the district court granted summary judgment to the defendants. The district court rejected plaintiffs' contention that the demonstration project exceeds the Secretary's authority under 42 U.S.C. § 1395b-1(a). The court explained that "Congress has provided the Secretary with the authority to develop experiments in an effort to increase Medicare's efficiency, and the Cataract Demonstration is just such an experiment, limited in duration and location, as well as being vastly restricted in scope and application." District Court's Memorandum of Opinion and Order Granting Defendants' Motion For Summary Judgment and Overruling Plaintiffs' Motion For Partial Summary Judgment ("District Court's Opinion and Order") at 17, 1992 WL 227769.
 
 
 19
 The district court further held that the Secretary's decisions to waive the usual payment system, and to waive the beneficiary's copayment, were well within the Secretary's waiver powers under 42 U.S.C. § 1395b-1(b). The court rejected plaintiffs' argument that the Secretary's waiver power is limited to payment and reimbursement schemes based upon a "reasonable cost/charge" payment system and explained that the Secretary may waive certain statutory requirements where these requirements relate to reimbursement or payment for such services or items "as may be specified in the experiment," District Court's Opinion and Order at 15, adding that "the Secretary has specified the services and items for which the statutory requirements pertaining to reimbursement or payment will be waived; accordingly the Secretary has stayed within his statutory authority." Id.
 
 
 20
 The district court further noted that if there was "some ambiguity in the statute," id. at 16, then the court "must defer to [the Secretary's] construction even if it may not be the only or even the most reasonable one." Id. The district court concluded that the Secretary's construction was entirely reasonable, if not compelled, by the plain language of the statute. Id.
 
 
 21
 The district court also rejected plaintiffs' argument that the demonstration project's payment methodology, under which HCFA may pay as much as 100 percent of the price for the medical services rendered, violates the Medicare Act's fraud and abuse statute, 42 U.S.C. § 1320a-7b(b)(1), which bars a physician from regularly waiving his patients' 20 percent copayments.
 
 
 22
 The district court also rejected plaintiffs' claims that the demonstration project violated the Medicare "freedom of choice" provision, 42 U.S.C. § 1395a, and the Medicare provision regarding the exercise of supervision and control over the practice of medicine, 42 U.S.C. § 1395. The court determined that the demonstration project does not violate a patient's freedom of choice because, under the project, a patient remains free to choose a health care provider who is not participating in the project. Moreover, the district court explained that in deciding to bundle cataract surgery services the Secretary is "not exercising control and supervision over the practice of medicine, but rather [is] making policy decisions in an effort to regulate Medicare coverage." District Court's Opinion and Order at 25.
 
 
 23
 Finally, the district court held that the cataract demonstration project does not violate the plaintiffs' constitutional equal protection rights because "there is a legitimate governmental purpose--testing alternative payment methodologies--underlying the Cataract Demonstration and ... the Demonstration is rationally related to that legitimate purpose." Id. at 27.
 
 
 24
 The plaintiffs timely filed their notice of appeal on July 10, 1992.
 
 II.
 Standard of Review
 
 25
 Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. A district court's grant of summary judgment is reviewed de novo. Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). In its review, this court must view all facts and inferences drawn therefrom in the light most favorable to the nonmoving party. 60 Ivy St. Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987).
 
 
 26
 The moving party has the burden of conclusively showing that no genuine issue of material fact exists. Id. Nevertheless, in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); 60 Ivy St. Corp., 822 F.2d at 1435.
 
 
 27
 "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the nonmoving party. 60 Ivy St. Corp., 822 F.2d at 1435. If the disputed evidence "is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. at 2511 (citations omitted).
 
 
 28
 Waiver of Medicare Reimbursement Requirements
 
 
 29
 Appellants contend that the Secretary lacks the authority to waive the customary Medicare payment and reimbursement requirements. The appellees maintain that the plain language of the Medicare Act provides the Secretary with such authority. The Act provides:
 
 
 30
 (b) Waiver of certain payment or reimbursement requirements; advice and recommendations of specialists preceding experiments and demonstration projects
 
 
 31
 In the case of any experiment or demonstration project under subsection (a) of this section, the Secretary may waive compliance with the requirements of this subchapter and subchapter XIX of this chapter insofar as such requirements relate to reimbursement or payment on the basis of reasonable cost, or (in the case of physicians) on the basis of reasonable charge, or to reimbursement or payment only for such services or items as may be specified in the experiment; and costs incurred in such experiment or demonstration project in excess of the costs which would otherwise be reimbursed or paid under such subchapters may be reimbursed or paid to the extent that such waiver applies to them (with such excess being borne by the Secretary).
 
 
 32
 42 U.S.C. § 1395b-1(b). The parties agree that the waiver in the instant action pertains only to items and services specified in the cataract demonstration.
 
 
 33
 The appellants' contention that the ordinary Medicare payment rules cannot be replaced by a negotiated bundled payment scheme is contradicted by the Act's plain language. The Act expressly allows the Secretary to carry out demonstration projects to test whether changes in the methods of payment and reimbursement, including changes based upon the use of "negotiated rates, would have the effect of increasing the efficiency and economy of health services ... without adversely affecting the quality of such services." 42 U.S.C. § 1395b-1(a)(1)(A).
 
 
 34
 When a court reviews an agency's interpretation of a statute which the agency administers, the court must undertake a two-step inquiry. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). If Congress has directly spoken on the "precise question at issue," the court "must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. at 2781-82. If the statute is silent or ambiguous with respect to the precise question at issue, the court may not simply impose its own construction. Id. at 843, 104 S.Ct. at 2782. Rather, the court must determine "whether the agency's answer is based on a permissible construction of the statute." Id. Simply stated, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Id. at 844, 104 S.Ct. at 2782. See also National R.R. Passenger Corp. v. Boston & Maine Corp., --- U.S. ----, ----, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992) ("Judicial deference to reasonable interpretations by an agency of a statute that it administers is a dominant, well settled principle of federal law ... [i]f the agency interpretation is not in conflict with the plain language of the statute."); Wayside Farm, Inc. v. HHS, 863 F.2d 447, 451-52 (6th Cir.1988) (a court must uphold the Secretary's construction of the Medicare Act unless the Secretary's construction is plainly unreasonable).
 
 
 35
 Accordingly, even if 42 U.S.C. § 1395b-1(b) was deemed ambiguous, the inquiry is not how appellants would prefer to construe this statute, but whether the agency's construction of the statute is permissible.
 
 
 36
 The district court rejected the plaintiffs-appellants' claim that the Act does not permit the Secretary to implement the Cataract Demonstration:
 
 
 37
 The Court finds that the Cataract Demonstration does not exceed the Secretary's waiver authority under 42 U.S.C. § 1395b-1(b). Section 1395b-1(b) provides, in relevant part, that the Secretary may waive compliance with deductible and coinsurance requirements insofar as such requirements relate to: (1) reimbursement or payment on the basis of reasonable cost, or (in the case of physicians) on the basis of reasonable charge; or (2) reimbursement or payment only for such services or items as may be specified in the experiment.
 
 
 38
 The plaintiffs have focused their arguments on limitation (1); however, the Court finds that provision (2) permits the Secretary to waive certain statutory requirements where these requirements relate to reimbursement or payment only for such services or items as may be specified in the experiment. The Court finds that the defendants have adhered to this provision in designing and implementing the Cataract Demonstration, i.e., the Secretary is authorized to conduct the Cataract Demonstration which will test whether a change from existing payment methods to one based on "negotiated rates" is advisable, so long as the Secretary "specifie[s] in the experiment" the "services or items" for which the statutory requirements pertaining to reimbursement or payment would be waived during the course of the demonstration. In the Cataract Demonstration, the Secretary has specified the services and items for which the statutory requirements pertaining to reimbursement or payment will be waived; accordingly, the Secretary has stayed within his statutory authority.
 
 
 39
 The Court further finds that Congress has directly spoken to the precise question at issue. As such, the Court must give effect to the unambiguously expressed intent of Congress. Accordingly, the defendants have not exceeded their authority to waive deductible and coinsurance requirements under the Cataract Demonstration.
 
 
 40
 ....
 
 
 41
 Even if the Court agreed with the plaintiffs that there was some ambiguity in the statute or that the statute was silent on the issue, the Court does not simply impose its own construction on the statute as would be necessary in the absence of an administrative interpretation. Under these circumstances, where the agency's construction is reasonable, the Court must defer to that construction even if it may not be the only or even most reasonable one. Accordingly, the Court finds that the Secretary's construction is reasonable, and that the Cataract Demonstration does not exceed the defendants' waiver authority for Medicare experiments and demonstration projects under 42 U.S.C. § 1395b-1. The Court further finds that the defendants' actions in this regard are not arbitrary, capricious, nor an abuse of discretion.The defendants have designed the Cataract Demonstration to test the feasibility of an alternate pricing arrangement for episodes of cataract surgery. The Demonstration is an experimental program limited in duration and location. The Demonstration shall run for three years. At the end of the three years, the project shall be terminated, and a final evaluation report shall be made. Also, the Demonstration shall be limited to three geographic areas--Cleveland, Ohio and Dallas-Ft. Worth, Texas. The third area was Albany, New York, which has been dropped from the Demonstration due to lack of interest, and a new location is now being considered.
 
 
 42
 The Demonstration does not alter or modify the whole Medicare program; it does not affect Medicare's coverage of all medical services, medical items, and health care providers. Instead, the Demonstration touches only cataract surgeries and, in fact, only specified varieties of cataract surgeries. Further, patient as well as health care provider participation is strictly voluntary in the Demonstration. The remainder of the Medicare program, namely, health care providers and patients, will continue to operate on the traditional fee-for-service payment methodology and will be unaffected by the Demonstration. Congress has provided the Secretary with the authority to develop experiments in an effort to increase Medicare's efficiency, and the Cataract Demonstration is just such an experiment, limited in duration and location, as well as being vastly restricted in scope and application.
 
 
 43
 District Court's Memorandum of Opinion and Order at 14-17.
 
 
 44
 The statute expressly allows demonstration projects to test the use of "negotiated rates," and permits the waiver of payment and reimbursement rules "for such services or items as may be specified" in the project. 42 U.S.C. § 1395b-1. Accordingly, it is reasonable to construe § 1395b-1 to allow the Secretary to waive the payment and reimbursement rules otherwise applicable to the items and services specified in the cataract alternative payment demonstration project, and to permit the payment of a negotiated fee rate instead.
 
 
 45
 Though the Act allows for the waiver of reimbursement and payment rules for "such services or items as may be specified" in the demonstration project, 42 U.S.C. § 1395b-1(b), the appellants contend that the waiver provision should be read to permit waiver only of items and services that are otherwise paid on a "reasonable cost" or "reasonable charge" basis. Prior to 1972, 42 U.S.C. § 1395b-1(b) provided that, when conducting an experiment, the Secretary could waive the requirements of the Medicare Act "insofar as such requirements relate to reimbursement or payment on the basis of reasonable cost, or (in the case of physicians) on the basis of reasonable charge." In 1972, Congress amended this language to expand the Secretary's waiver authority to the current text in order to permit a wider variety of demonstration projects to test alternative payment schemes, including payment schemes based upon negotiated rates. Specifically, Congress added the following language (italicized) to the 1968 waiver provision:
 
 
 46
 [S]uch requirements relate to reimbursement or payment on the basis of reasonable cost, or (in the case of physicians) on the basis of reasonable charge, or to reimbursement or payment only for such services or items as may be specified in the experiment.
 
 
 47
 Pub.L. No. 92-603, § 222(b)(2), 86 Stat. 1393 (1972).
 
 
 48
 Pursuant to the 1972 amendment, it is reasonable to construe section 1395b-1(b) to allow the Secretary to establish a demonstration project to test a negotiated rate system of reimbursement so long as the items and services covered by the experimental rate system are specified in the project.
 
 
 49
 Though the appellants assert that the parenthetical in the 1972 amendment restricts the Secretary's authority to waive reimbursement and payment rules for physician services that are based upon a "reasonable charge" only, the appellants' construction of § 1395b-1(b) would emasculate the Secretary's waiver power because physician services are now based upon fee schedules, not upon a "reasonable charge" methodology. 42 U.S.C. § 1395w-4.
 
 
 50
 Because the statutory language supports the Secretary's power to establish a demonstration project to test a negotiated rate payment system, and grants the Secretary authority to waive the payment and reimbursement rules for the services specified in the project, we reject the appellants' claim that the demonstration project violates section 1395b-1.
 
 
 51
 Medicare's Anti-Fraud and Freedom of Choice Provisions
 
 A. Anti-Fraud
 
 52
 The cataract demonstration requires that HCFA and interested participants negotiate a bundled rate to cover the cost of an ordinary cataract surgery episode. In theory, the negotiated rate agreed to by HCFA and the participant could provide for HCFA paying 100 percent of the agreed costs. If HCFA agreed to pay 100 percent, then the patient would not have to pay the ordinary 20 percent copayment. HCFA's payment could be as low as the standard 80 percent, however, with the beneficiary responsible for the remainder.
 
 
 53
 Plaintiffs argue that HCFA's payment of 100 percent of the costs under the demonstration project would violate the Act's "anti-fraud" statute, 42 U.S.C. § 1320a-7b, and "freedom of choice" provision, 42 U.S.C. § 1395a. The district court rejected these arguments.
 
 
 54
 42 U.S.C. § 1320a-7b(b)(1) ("Illegal remunerations") provides:
 
 
 55
 (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
 
 
 56
 (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program, or
 
 
 57
 (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program,
 
 
 58
 shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
 
 
 59
 Id.
 
 The district court held:
 
 60
 The Court finds that the Cataract Demonstration does not violate the Medicare Fraud and Abuse statute, 42 U.S.C. § 1320a-7b(b). Under the Demonstration, the HCFA may approve a payment methodology where Medicare will pay 100 percent of the total package price for the cataract surgery. As the defendants have pointed out, there are numerous situations in which Medicare pays 100 percent of the cost for medical services. Pursuant to the Secretary's authority to conduct demonstration projects, he has designed a project to test the merits of a bundled payment methodology. Regardless of whether the alternative payment methodology is viewed as including deductible and copayment waiver or as Medicare paying 100 percent of the total package price, no one is being misled, deceived, or misdirected. The court further finds that the defendants' actions in this regard are not arbitrary, capricious, or an abuse of discretion.
 
 
 61
 District Court's Opinion and Order at 22.
 
 
 62
 The appellees argue that, subsequent to the district court's decision, this issue has become moot because:
 
 
 63
 it has become crystal clear that the negotiated rates that will be employed by all of the facilities participating in the demonstration project will require HCFA to pay only the ordinary 80 percent and the beneficiary will still pay the standard 20 percent copayment. All of the contracts in the project are now either final or near final, but in every case the parties have agreed to retain the ordinary 80 percent to 20 percent HCFA-beneficiary payment ratio.
 
 
 64
 Appellee's Brief at 32.
 
 
 65
 In support thereof, the HCFA director announced (in relevant part):
 
 
 66
 1. I am the Director of the Office of Research and Demonstrations, Health Care Financing Administration (HCFA).... Some of the responsibilities of the office are to design, implement, and evaluate research and demonstration projects that have the possibility of improving the efficiency and effectiveness of the Medicare program.
 
 
 67
 ....
 
 
 68
 4. The proposed demonstration project has progressed beyond the solicitation and review process. Final provider sites have been recommended by an internal and external group of clinical and technical experts, and HCFA has conducted negotiations with the providers in all three geographic areas: Cleveland, Dallas-Fort Worth and Phoenix. The Albany-Troy area was dropped from consideration because of a lack of interest in the project by the area providers, and Phoenix was substituted in its place.
 
 
 69
 ....
 
 
 70
 6. During July and August 1992, negotiations were held with the remaining providers in the geographic areas of Cleveland and Dallas-Fort Worth, and in September, we conducted negotiations with the Phoenix providers. HCFA now anticipates implementing the demonstration in three provider settings in Cleveland, two in Dallas-Forth Worth and one in Phoenix on the same basic timeframe. These six provider groups are the final participants at this time, and we do not plan to add additional areas or provider groups in the existing areas.
 
 
 71
 7. In all 3 areas, HCFA and each individual provider have agreed on many specific details including a combined price for cataract surgery for both physician and facility components. This combined price is less than what Medicare would pay absent the demonstration. The Medicare beneficiary will continue to be responsible for deductible and coinsurance under the demonstration at each provider location. The beneficiaries' coinsurance amount will be established at 20 percent of the individual provider's combined price for the cataract surgery.
 
 
 72
 Third Declaration of Joseph R. Antos, Ph.D. at 1-3.
 
 
 73
 Because Director Antos' declaration clearly reveals that the agreements do not contain the contested features of the Cataract Demonstration, we need not address the appellants' claim under 42 U.S.C. § 1320a-7b. See United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980) (a case becomes moot when the disputed issues are no longer "live" or the parties have no personal stake in the outcome); Zanders v. O'Gara-Hess & Eisenhardt Armoring Co., 952 F.2d 404 (6th Cir.1992) (unpublished) ("[W]hen the plaintiff receives the relief he seeks, ... the case becomes moot.").
 
 B. Freedom of Choice
 
 74
 The appellants claim that the demonstration project will impair a Medicare beneficiary's right to select a qualified health care provider as guaranteed under the Medicare Act. 42 U.S.C. § 1395a.[1] The district court rejected this claim:
 
 
 75
 The Court finds that the Cataract Demonstration does not violate the Medicare freedom of choice provisions of 42 U.S.C. § 1395a. A patient in need of cataract surgery, or any medical care, considers many factors when choosing a particular physician to perform the surgery, i.e., quality of care, reputation of the physician, cost to the patient, location of the physician, availability of the physician, etc. Cost to the patient is but one of many factors. Accordingly, a patient seeking cataract surgery remains free to choose a Demonstration provider or a non-Demonstration provider. It is not as if the Demonstration creates exclusive providers for cataract surgery. The Court further finds that the defendants' actions in this regard are not arbitrary, capricious, nor an abuse of discretion.
 
 
 76
 District Court's Opinion and Order at 24.
 
 
 77
 Because the cataract demonstration does not compel Medicare beneficiaries to use any particular doctor or facility, we reject the appellants' "freedom of choice" claim.
 
 
 78
 Supervision and Control Over the Practice of Medicine
 
 
 79
 Appellants assert that the negotiated payments will dictate the type and level of care that will be offered by doctors and that this is tantamount to "supervision and control" of the practice of medicine in violation of the Act which provides:
 
 
 80
 Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, [or] to exercise any supervision or control over the administration or operation of any such institution, agency, or person.
 
 
 81
 42 U.S.C. § 1395. The district court rejected the appellants' contention:
 
 
 82
 The Court finds that the Cataract Demonstration does not enable the defendants to exercise illegal supervision over the practice of medicine in violation of 42 U.S.C. § 1395. In making the decisions as to what services will be included in the bundle, the defendants are not exercising control and supervision over the practice of medicine, but rather the defendants are making policy decisions in an effort to regulate Medicare coverage. The Court finds that the Demonstration does not create a clear incentive for ophthalmologists not to prescribe care above and beyond that which is included in the bundled items in a complex case. Such an assertion is unfounded. Further, the Court finds that the Demonstration's alternative payment methodology may affect patient patterns; however, this does not amount to supervising or controlling the practice of medicine. The Court further finds that the defendants' actions in this regard are not arbitrary, capricious, nor an abuse of discretion.
 
 
 83
 District Court's Opinion and Order at 25-26. We agree.
 
 
 84
 The experimentation with a bundled payment does not control or compel the type of services provided. It is the health care provider, not the Secretary, who decides what type of services are required. If a patient has a complicated case that requires care beyond that encompassed by the project, then that treatment will be paid by HCFA under the ordinary fee-for-service payment scheme. Because this project does not serve as a mechanism to supervise or control the practice of medicine, we reject the appellants' third assignment of error.
 
 Equal Protection
 
 85
 Appellants argue that the Secretary is violating their equal protection rights by paying 100 percent of the costs under the demonstration project.
 
 
 86
 The district court rejected the appellants' equal protection claim:
 
 
 87
 The Court finds that the Cataract Demonstration does not deny ophthalmologists equal protection of the laws in violation of the due process clause of the fifth amendment to the Constitution. The Court finds that there is a legitimate governmental purpose--testing alternative payment methodologies--underlying the Cataract Demonstration, and that the Demonstration is rationally related to that legitimate purpose.
 
 
 88
 District Court's Opinion and Order at 27.
 
 
 89
 In light of Director Antos' declaration, this issue is rendered moot and need not be addressed because the demonstration project's negotiated contracts do not call for 100% reimbursement.
 
 III.
 
 90
 We AFFIRM the district court's Opinion and Order for the aforementioned reasons.
 
 
 91
 KENNEDY, Circuit Judge, dissenting.
 
 
 92
 I agree with much of the majority opinion but disagree with the majority's disposition of the equal protection issue and with that portion of section II entitled "Waiver of Medicare Reimbursement" and, as a result, the outcome. Because I find the Cataract Demonstration to exceed the authority of the Secretary to waive the ordinary statutory reimbursement requirements granted in 42 U.S.C. § 1395b-1(b), I would reverse the decision of the District Court.
 
 
 93
 The majority begins its analysis by stating, on page 382, that the "contention that ordinary Medicare payment rules cannot be replaced by a negotiated bundled payment scheme is contradicted by the Act's plain language." It then cites and quotes for this proposition the authorization for the development of experimental reimbursement projects found in 42 U.S.C. § 1395b-1(a)(1)(A). While section 1395b-1(a)(1)(A) may authorize the development of such projects, in light of the detailed reimbursement provisions in the Act and the specific requirement for waiver of those statutory reimbursement provisions, found in section 1395b-1(b), the majority's implication that the issue begins and ends with section 1395b-1(a)(1)(A) is misleading. Even demonstration projects "increasing the efficiency and economy of health services ... without adversely affecting the quality of such services," the mandate of section 1395b-1(a)(1)(A), must still either comply with the ordinary statutory reimbursement scheme or come within the authority to waive those provisions found in section 1395b-1(b). Thus, whether a particular demonstration project is "contradicted" by the "plain language" of section 1395b-1(a)(1)(A) may be a threshold issue, but it does not finally resolve the ultimate issue of whether such a project "is contradicted by the Act's plain language." In the present case, since the Cataract Demonstration involves a reimbursement scheme different than the ordinary statutory reimbursement provisions, the issue must ultimately be decided on the waiver authority found in section 1395b-1(b).
 
 
 94
 The majority correctly summarizes the appropriate standard for reviewing agency interpretation of a statute administered by that agency. Deference to the construction given to a statute by the agency primarily involved in administering it is an important principle of agency law. There are, however, as the majority recognizes, several analytic steps which must be satisfied before deference is appropriate. The reviewing Court first must determine whether Congress has directly spoken "unambiguously" on the "precise question at issue." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). If Congress has spoken, then the court must follow the statute. Id. If the statute does not directly address the issue or does so ambiguously, then the court must determine whether the administering agency's interpretation of the statute is a "permissible" one. Id. Only if this latter step is fulfilled should a reviewing court defer to the agency interpretation. Id. A permissible construction of a statute is one "not in conflict with the plain language of the statute." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 292, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." Id. at 291, 108 S.Ct. at 1818.
 
 
 95
 The interpretation followed by the Secretary, the District Court, and the majority is a simple one. Reading the last clause of the waiver by itself--which states that the Secretary may waive compliance with reimbursement requirements "insofar as such requirements relate to ... reimbursement or payment only for such services or items which may be specified in the experiment"--authorization is found for waiving any reimbursement requirement as long as the experiment specifies it. According to a passage from the District Court quoted by the majority, "the Secretary is authorized to conduct the Cataract Demonstration which will test whether a change from existing payment methods to one based on 'negotiated rates' is advisable, so long as the Secretary 'specifie[s] in the experiment' the 'services or items' for which the statutory requirements pertaining to reimbursement or payment would be waived during the course of the demonstration." Panel Op. at 383 (quoting District Court Memorandum Opinion and Order at 14).
 
 
 96
 Unfortunately, this simple and, at first glance, apparently plausible construction of the statute employed by the Secretary, the District Court, and the majority is not a permissible one. To read the last clause of the waiver found in section 1395b-1(b) in this way is to render the previous two clauses meaningless. As the majority and District Court implicitly recognize, the Secretary's reading means that any statutory reimbursement requirement may be waived as long as it is "specified in the experiment." Such a broad reading makes the last clause the only of the three waiver clauses which need ever be employed. Under this interpretation there would be no need to resort to the first waiver clause, which authorizes waivers of requirements relating "to reimbursement or payment on the basis of reasonable cost," or the second waiver clause, which authorizes waivers of requirements relating to reimbursement or payment "(in the case of physicians) on the basis of reasonable charge," because such waiver authority could be established in every case simply by specifying the change in the experiment. A reading of a statute that renders two-thirds of the operative language meaningless cannot be a reasonable or permissible one.
 
 
 97
 In order to give meaning to the first two waiver clauses, the entire sentence must be read as including three categories of authorized waivers: reasonable cost reimbursements, reasonable charge physician fees, and other reimbursements or waivers the experiment specifies. The parenthetical phrase "in the case of physicians" thus indicates that the second waiver clause is the exclusive grant of waiver power in regard to physicians. Read this way, section 1395b-1(b) grants the Secretary authority to waive the statutory reimbursement methods for physicians where they are based on the reasonable charge method. In regard to physicians, no further waiver authority is granted. Therefore, because the fees involved in cataract surgery are, since 1992, based on the fee schedule mandated by section 1395w-4 and not on the reasonable charge method, there is no authorization for the bundling method employed by the Cataract Demonstration inasmuch as it reimburses physicians at any rate other than the fee schedule rate.
 
 
 98
 As the majority acknowledges, the third and final waiver clause was added to section 1395b-1(b) in 1972 in order to expand the design possibilities for demonstration projects. See Pub.L. No. 92-603, § 222(b)(2), 86 Stat. 1393 (1972). The Secretary argues that any interpretation other than the one it proposes essentially ignores the 1972 amendment. I disagree. Under interpretations that allow the first two clauses to have meaning, the third clause still increases the waiver power of the Secretary. Further, the later addition of the third clause points out the importance of reading section 1395b-1(b) in such a way that all three clauses have meaning. If Congress had intended, in passing the 1972 amendment, to remove any limitations on waiver authority that might result from the first two clauses, it could easily have struck the two existing clauses when it added the third. It did not.
 
 
 99
 The majority responds to this construction of section 1395b-1(b) in an abbreviated paragraph on page 386. The majority correctly observes that if the parenthetical phrase "in the case of physicians" is read to indicate that the clause it modifies is the sole waiver in regard to reimbursement of physicians, then only physicians' reimbursements based on a reasonable charge may be modified in a demonstration project. The majority correctly observes that since reimbursement of physicians' services is now based on fee schedules, under section 1395w-4, and not on the reasonable charge basis, this leaves the Secretary without power to waive the statutory reimbursement provisions in regard to physicians. Without any further analysis, the majority simply concludes that such a result is not one the statute should be read to mandate. I do not see why such a construction is inappropriate. Unlike the majority's construction, it gives meaning to all three waiver clauses of section 1395b-1(b). If Congress had desired, in changing from the reasonable charge basis to a fee schedule basis for physician reimbursement, to grant the Secretary new authority to waive such reimbursement provisions, it could easily have done so at that time. It did not. It left section 1395b-1(b) as written.[1]
 
 
 100
 Finally, I must also note my disagreement with the majority's disposition of the plaintiffs' equal protection challenge. After quoting the District Court's holding that the Secretary possesses a "legitimate governmental purpose" to which the Cataract Demonstration is "rationally related," the majority holds that the issue is moot because of an announcement by the director of the HCFA, Dr. Joseph R. Antos. Director Antos' announcement states that "HCFA and each individual provider have agreed on many specific details," including maintaining the requirement that beneficiaries continue to pay 20 percent of the cataract surgery. Panel Op. at 21. This "announcement" is a tenuous basis for disposing of the assertion of such an important constitutional right. Director Antos' statement does not indicate what form the agreements reached with the providers take, or that in any way they are binding. Terms reached by agreement with the providers presumably can be cancelled or modified in the same way.
 
 
 101
 Plaintiffs' equal protection challenge is a serious one. If the Cataract Demonstration is implemented in its original form, with the Secretary reimbursing for 100 percent of cataract surgery and thus requiring no coinsurance or deductible from the beneficiary, then patients using a Cataract Demonstration provider will effectively be paying nothing for their surgery, while patients using a non-Cataract Demonstration provider will be paying 20 percent of the cost of the surgery. What plaintiffs challenge is the fate which might await any non-Cataract Demonstration physician who would attempt to counter the obvious economic consequences of this situation by reducing the fee and charging only 80 percent of the cost of the surgery (i.e., waiving the coinsurance and deductible requirement): Medicare fraud prosecution under 42 U.S.C. § 1320a-7b(b)(1). In other words, the routine billing practice of one physician participating in the Cataract Demonstration, in which the beneficiary is required to pay no portion of the cost of the surgery, would subject another, non-participating physician to criminal charges. It is this unequal treatment which plaintiffs would require to be supported by a rational basis. It is hard to say that in the face of such a serious threat to their livelihood and the tenuousness of the agreements on which the majority depends, non-Cataract Demonstration ophthalmologists "have no personal stake," Panel Op. at 22 (citing United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980)), in appellate review of their equal protection challenge.
 
 
 
 [1]
 42 U.S.C. § 1395a provides:
 Any individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter if such institution, agency, or person undertakes to provide him such services.
 
 
 [1]
 In fact, members of the House of Representatives in floor debate have discussed the scope of section 1395b-1(b)'s waiver authority in relation to the Cataract Demonstration. I recognize that "subsequent legal history is a 'hazardous basis for inferring the intent of an earlier' Congress." Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990) (quoting United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960)). However, where statements by members of Congress support a construction of a statute derived from the words and structure of the statute itself, they are worthy at least of noting. This is especially true when this legislative history is directed at precisely the issue being litigated. In floor debate, Representative Stark, Chair of the Health Subcommittee of the Ways and Means Committee of the House of Representatives, agreed with Representative Solomon that the Secretary would exceed the waiver authority of section 1395b-1(b) in regard to physician reimbursement if the Secretary utilized a bundled fee method. 137 Cong.Rec. H5110 (Daily Ed., June 26, 1991) (discussion of Representatives Solomon, Stark, and Natcher). This statement was based upon the change in physician reimbursement, in the 1989 Amendments to the Medicare Act, from reasonable charge to a fee schedule. At one point during this colloquy, Rep. Solomon inquired of Rep. Stark, "Under [the fee schedule] reimbursement methodology, does [the Secretary,] pursuant to Section 1395b-1(b), have the authority to waive either the fee schedule or the deductible and coinsurance requirements as envisioned in the cataract demonstration project?" Id. Rep. Stark responded that as he understood section 1395b-1(b), "the [Secretary] does not have the necessary authority." Id. To Rep. Stark, the changes in physician reimbursement methodology in the Cataract Demonstration violated the "clear statutory limitation" on the Secretary's authority found in section 1395b-1(b). Id