COMMUNITY FIRST BANK; Independent Bank; The Ionia County National Bank of Ionia; Union Bank, Plaintiffs–Appellants,

v.

The NATIONAL CREDIT UNION ADMINISTRATION; Portland Federal Credit Union, Defendants–Appellees.

No. 93–2244.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1994.

Decided Dec. 5, 1994.

whether the district court improperly granted summary judgment in favor of Portland Federal and NCUA.

William K. Holmes and Robert J. Jonker (argued and briefed), Warner, Norcross & Judd, Grand Rapids, MI, for plaintiffs-appellants.

Thomas J. Gezon, Asst. U.S. Atty., Office of the U.S. Atty., Grand Rapids, MI, Douglas N. Letter, Dept. of Justice, Appellate Staff, Civ. Div.; and Jonathan R. Siegel (argued and briefed), U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendant-appellee.

Thomas J. Gezon, Asst. U.S. Atty., Office of the U.S. Atty., Grand Rapids, MI, Steven Widerman, Office of Gen. Counsel, Nat. Credit Union, and Kenneth L. Doroshow, U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendant.

Michael F. Crotty (briefed), American Bankers Ass'n; and Teresa Burke (briefed), and Paul J. Lambert, Bingham, Dana & Gould, Washington, DC, for amici curiae.

Before: KEITH, WELLFORD, and DAUGHTREY, Circuit Judges.

WELLFORD, Circuit Judge.

Four Michigan banks, competitors of Portland Federal Credit Union ("Portland Federal") challenge the National Credit Union Administration's ("NCUA") decision to allow Portland Federal to expand its service area to all of Ionia County, Michigan. The district court granted summary judgment in favor of NCUA and Portland Federal, 832 F.Supp. 1118. The plaintiff banks filed a timely appeal with this court challenging the action of NCUA in granting the expansion and the district court's approval thereof.

On appeal, defendant Portland Federal challenges the standing of the banks to contest its expansion. Assuming the banks do have standing, the second issue becomes

## I. *PROCEDURAL BACKGROUND*

Portland Federal is a tax-exempt, community-based credit union, located in Ionia County, Michigan. Although Portland has a population of only 4,000 people, the surrounding rural areas around Portland have a population of about 70,000 people. It is these rural areas that Portland Federal is attempting to reach.[1] One of the prime targets of expansion is the City of Ionia, which is about the same size as Portland but is the county seat. Much of the litigation involves whether Ionia and Portland are one "community."

From humble beginnings in 1947 as an *occupational* credit union, Portland Federal has expanded to meet the needs of this relatively small rural area around Portland. In 1953, it converted to a community-based organization, serving persons within a six-mile radius of the Portland Post Office. In 1981, it amended its charter again to include certain adjacent portions of Clinton County and Eaton County and certain additional portions of Ionia County, all immediately surrounding the City of Portland. It sought, in August of 1992, to amend its charter to include the remainder of Ionia County, and about one-fourth of neighboring Clinton County.

Four nearby competitor private banks contest this requested expansion,[2] arguing that the region does not constitute a "community" for purposes of establishing a required "common bond" within the meaning of the Federal Credit Union Act, 12 U.S.C. § 1759. Plaintiffs stress that "[t]he proposed field of membership covered over 70,000 persons and numerous distinct communities within Ionia County, including two cities comparable to or

---

1. After making concessions to the areas covered by other community credit unions, the geographical area of expansion has a population of about 44,000.

2. Several credit unions also contested Portland's expansion, arguing that the expansion would create overlaps with their fields of membership. Portland Federal made concessions to these credit unions to avoid overlapping jurisdictions; these changes are reflected in the approved geographical service area in which NCUA permitted Portland Federal to serve.

larger than Portland, Ionia and Belding."[3] The proposed area of expanded membership also touched "three separate United States Congressional Districts, three separate state Senatorial districts, six public school districts, and two separate area codes" according to plaintiffs. The competitor banks also presented a marketing study (which had been conducted by the Ionia County Board of Commissioners to study the quality of the county's governmental services) for the proposition that little commercial intercourse existed between Portland and Ionia.

Portland Federal challenges the banks' reliance on this marketing study, arguing that the competitor banks selectively picked data from the largest cities, even though the study relied upon by the banks was a county-wide study and the disclaimer on the report stated that the study was "based on a countywide sample and the survey design never intended to produce information reliable at the level of individual cities or townships." Portland Federal submitted their own marketing study, which demonstrated, among other things,

> that the city of Ionia was the county seat of Ionia county, to which many people regularly traveled on business; survey results showing that people regularly commute in the area; shared characteristics and concerns of persons in the area; and the likeness of the proposed area to a regulatory example ... of a permissible area contained in the agency's [regulations].

Portland Federal also presented demographic evidence to demonstrate that the two towns share common characteristics. They pointed to survey responses of its customers as to the advisability of expanding the credit union to demonstrate that Ionia County residents consider the entire county one community. The majority of responses reflect that many members of the credit union have commercial transactions in both towns.

If plaintiffs have standing, we have jurisdiction over this appeal from a final order of the district court pursuant to 28 U.S.C. § 1291. The district court properly exercised jurisdiction pursuant to 28 U.S.C. § 1331 as this action arose under the Federal Credit Union Act, 12 U.S.C. § 1751, *et seq.*

## II. STANDING OF BANKS TO CHALLENGE THE AGENCY'S DECISION

A. *Standing requirements cannot be waived by individual parties.*

■ Portland Federal did not prevail on the standing issue raised in the district court, but failed to cross-appeal the district court's judgment, approving expansion. Plaintiffs argue that Portland Federal has waived its standing challenge by failing to cross-appeal. Plaintiffs seek to rely on the Supreme Court's distinction in several cases between constitutional and prudential standing requirements. The Supreme Court has recognized that constitutional standing requirements cannot be waived, but there may be a waiver of prudential standing requirements. Plaintiffs suggest that individual parties may waive prudential standing requirements if they fail to raise standing as an issue on cross-appeal.

■ We disagree with plaintiffs on this contention. Standing is not an affirmative defense that must be raised at risk of forfeiture. Instead, it is a qualifying hurdle that plaintiffs must satisfy even if raised *sua sponte* by the court. We find no authority for the plaintiffs' argument that prudential standing requirements may be waived by the parties. Recognizing a distinction between prudential and constitutional standing requirements in this context might give careless parties power to override congressional intent.

B. *Competitor banks are suitable challengers to a credit union expansion.*

■ The real issue is whether the plaintiffs satisfy the prudential standing requirements. To meet these standing require-

---

3. It should be noted that plaintiffs focus on Portland Federal's original request, which sought to expand into a geographical area that contained 70,000 people. The agency only authorized expansion into a geographical area that contains 44,000 people, eliminating Belding from the approved area. The county had a 1990 population of about 50,000.

ments under § 702 of the Administrative Procedure Act (APA), 5 U.S.C. § 702, plaintiffs must establish 1) that they have suffered a legal wrong because of the challenged agency action, or, are adversely effected within the meaning of a relevant statute, and 2) that the injury they complain of is within the zone of interests of the statutory provision which forms the legal basis of their complaint. *Air Courier Conference of America v. American Postal Workers Union,* 498 U.S. 517, 522–25, 111 S.Ct. 913, 917–18, 112 L.Ed.2d 1125 (1991). Have plaintiffs in this case met the second part of the test—the "zone of interest" test?

■ The "zone of interest" test excludes those plaintiffs whose "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). "The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Id.* (citations and footnote omitted).

■ The two courts that have addressed whether banks have standing to challenge charter expansions of credit unions under the Federal Credit Union Act have reached contrary results. *See First National Bank & Trust Co. v. National Credit Union Admin.,* 988 F.2d 1272 (D.C.Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 288, 126 L.Ed.2d 238 (1993) (holding banks do have standing); *Branch Bank & Trust v. National Credit Union Admin.,* 786 F.2d 621 (4th Cir.1986), *cert. denied,* 479 U.S. 1063, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987) (holding banks do not have standing). We enter the debate now and grant standing to the competitor banks.

It should be noted that in both *First National* and *Branch Bank,* the courts concluded that banks do not meet the "zone of interest test" because the legislative history demonstrates that Congress intended to promote the growth of credit unions, not insulate banks from competition. *See First National,* 988 F.2d at 1275; *Branch Bank,* 786 F.2d at 625–27. During the interim between these cases, however, the Supreme Court reemphasized that even if a plaintiff were not the intended beneficiary of the legislation, it would nevertheless have standing to sue if the interest it asserted had a plausible relationship to the policies underlying the legislation. *Clarke,* 479 U.S. at 403, 107 S.Ct. at 759. The later *First National* opinion, relying on *Clarke,* held that banks were *suitable challengers* to credit union expansion because they can protect congressional interests in requiring credit union members to share a common bond. Congress, in enacting this legislation, felt that requiring some connection between borrowers and depositors would enhance credit union stability because borrowers would be less likely to default.

Although the competitor banks are more concerned with limiting competition than they are with promoting credit union stability, allowing banks to challenge the common bond provision furthers Congress' objectives in some respects. Refusing to allow competitor banks to challenge credit union expansion might preclude any challenge to an excessively risky credit union expansion. It is doubtful that potential users or members of the credit union would have sufficient insight at the onset to realize that the expansion in question was risky (and if they did have this insight, they would simply refuse to invest their money with the credit union instead of litigating the expansion issue). Other credit unions might also have no interest in objecting to an excessive expansion, unless it conflicted with their own limited jurisdiction. Nor do consumer protection groups appear to be adequate substitutes for banks, who have sufficient adverse interests to challenge a questionable credit union expansion. As was the court in *First National,* we are of the opinion that the competitor banks are suitable challengers to the NCUA's action and do have standing.

### III. WAS NCUA'S DECISION ARBITRARY AND CAPRICIOUS?

■ We review the district court's decision de novo, applying the appropriate standard of review to the agency's decision. *Schuck v.*

*Frank,* 27 F.3d 194, 197 (6th Cir.1994). The appropriate standard of review for the agency action in this case is the abuse of discretion standard. 5 U.S.C. § 706(2)(A) (providing that agency decisions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). *See also Goldin v. FDIC,* 985 F.2d 261, 263 (6th Cir.1993) ("While a court reviewing agency determinations should not be a rubber stamp, the arbitrary and capricious standard is deferential toward agency decisions.").

## IV. DEFINITION OF "COMMUNITY"

■ The Federal Credit Union Act limits membership in credit unions to "groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district." 12 U.S.C. § 1759. The statute does not define a common bond, but gives the NCUA authority to regulate credit union membership. The NCUA issued regulations in 1989 that govern the chartering of credit unions:

> Given the diversity of community characteristics throughout the country and NCUA's goal of making credit union service available to all eligible groups who wish to have it, NCUA has established the following common bond requirements:
>
> a. The geographical area's boundaries must be clearly defined; and
>
> b. The charter applicant must establish that the area is recognized by those who live and work there as a distinct "neighborhood, community, or rural district."

54 Fed.Reg. 31,165 (1989) (incorporated by reference into 12 C.F.R. § 701.1).

The *amici* briefs submitted on behalf of several banks challenge the NCUA's definition of community. They urge this court to adopt a narrower interpretation of the term, such as a geographical place with a singular name or "a small city or town, such as the city of Ionia."

■ This court is not free simply to impose its own construction of the statute. *American Academy of Ophthalmology, Inc. v. Sullivan,* 998 F.2d 377 (6th Cir.1993). "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The inquiry "is not how appellants would prefer to construe this statute, but whether the agency's construction is permissible." *American Academy,* 998 F.2d at 383.

The NCUA's regulations defining "community" (a clearly defined geographical area whose residents identify it as a distinct area) constitute a permissible definition of community. It is not inconsistent with the Webster's definition of community: "the people with common interests living in a particular area; *broadly:* the area itself." Webster's New Collegiate Dictionary, p. 227 (1981).

The *amici* banks also argue that the agency's definition is arbitrary because it has changed several times over the last sixty years. We do not agree. The Supreme Court, in *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), stated:

> [A] revised interpretation deserves deference because "[a]n initial agency interpretation is not instantly carved in stone" and "the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." An agency is not required to " 'establish rules of conduct to last forever,' " but rather "must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.' "

*Id.* at 186–87, 111 S.Ct. at 1769 (citations omitted). It is not surprising that the agency may have changed its policies several times since 1934, since the national economy, and the composition of communities, has changed substantially over the years.

## V. WAS THE DECISION TO ALLOW EXPANSION AN ABUSE OF DISCRETION?

[9] Substantial evidence exists in the administrative record to support the NCUA's decision to allow Portland Federal to expand.

The district court's opinion considers this evidence.

Ionia is the county seat of the county and is the economic center of the county. The marketing analysis observed that "many people, including Portland Federal's members, regularly travel there to conduct business." A survey conducted by Portland Federal of its members strongly recommended expansion, citing the convenience of an Ionia branch. Portland Federal presented demographic evidence that demonstrated many residents of both towns share similar characteristics. Another survey conducted by the Ionia County Chamber of Commerce reflected that a majority in both towns rated Ionia County's rural environment as important. Portland and Ionia are, of course, both located in a rural county. Geographical proximity alone may have been enough to establish a "community."

That the proposed area of expansion touches six school districts, has a variety of political jurisdictions, has several religious districts, is located in different telephone area codes, and is served by separate local newspapers is not of determinative significance.

## VI. *CONCLUSION*

We believe there was a proper weighing of the interests of the parties in this case. The definition utilized on what comprises a common community is not unreasonable. There is a common bond involved. We add, however, that this decision is confined to the facts of this case; it is not intended to establish a precedent that community federal credit unions, or persons in a similar status, are free to expand to an entire county or to an adjacent county. Each case must be viewed on its own merits.

We, accordingly, **AFFIRM** the agency's decision and the decision of the district court.