FIRST CITY BANK, et al.

v.

NATIONAL CREDIT UNION
ADMINISTRATION, et
al.

No. 3:94–0334.

United States District Court,
M.D. Tennessee,
Nashville Division.

Sept. 13, 1995.

Randall Steven Mashburn, Scott D. Carey, Baker, Donelson, Bearman & Caldwell, P.C., Nashville, TN, and Rodney M. Scott, Murfreesboro, TN, for plaintiffs.

Anne L. Weismann, Eric Johnson Mahr, Arthur R. Goldberg, Department of Justice, Civil Division, Washington, DC, William McMillian Leech, Jr., Michael Robert Paslay, Waller, Lansden, Dortch & Davis, Nashville, TN, Paul J. Lambert, Teresa Burke, Bingham, Dana & Gould, Washington, DC, and Brenda S. Furlow, Credit Union National Association, Inc., Madison, WI, for defendants.

### *MEMORANDUM*

WISEMAN, District Judge.

### *Facts*

Plaintiffs First City Bank and Tennessee Bankers Administration have brought suit against Defendants National Credit Union Administration ("NCUA"), AEDC Federal Credit Union ("AEDC"), Tennessee Credit Union League and Credit Union National Association, Inc., claiming NCUA incorrectly interpreted the "common bond" provision of the Federal Credit Union Act ("FCUA"), giving AEDC and other credit unions an unfair and illegal competitive advantage against banks. Both Plaintiffs and Defendants have filed for summary judgment.

The FCUA's common bond provision states, "Federal credit union membership

shall be limited to groups having a common bond of occupation or association, or to groups within a well defined neighborhood, community, or rural district." 12 U.S.C. § 1759. Until 1982, NCUA and its predecessor agencies interpreted this provision to require all members of a credit union to have a single common bond with one another. In 1982, however, NCUA changed its policy, promulgating a rule allowing multiple unrelated groups to join the same credit union as long as each group had a common bond among its members. 47 Fed.Reg. 16775 (1982).[1] Pursuant to this "select group" membership policy, NCUA approved AEDC's amended charters, allowing AEDC to expand its field of membership to include hundreds of disparate employee groups.

Plaintiffs claim NCUA's approvals of AEDC's charter amendments were improper because they were based on the select group policy, which Plaintiffs believe is an illegal interpretation of the common bond provision. Plaintiffs have therefore requested the select group policy and NCUA's approvals of AEDC's membership groups based on this policy be set aside as abuse of discretion, pursuant to 5 U.S.C. § 706 of the Administrative Procedures Act ("APA"). Defendants counter that the select group policy constitutes a reasonable interpretation of the common bond provision and that NCUA therefore properly relied on this policy in approving AEDC's amended charters.

### Discussion

■ No material questions of fact preclude summary judgment in this case. The sole issue is the purely legal question of whether NCUA's select group policy is a valid interpretation of the FCUA's common bond provision. The APA permits courts to review statutory interpretations of administrative agencies engaged in rulemaking. 5 U.S.C. § 706. The Supreme Court has articulated a two step process a court must follow in reviewing such interpretations. *Chevron*

U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). First, the court must determine if Congress has addressed the precise legal issue at hand. *Id.* If Congress has clearly addressed the issue, the court must give effect to the expressed congressional intent. *Id.* If Congress has not addressed the specific issue, the court must defer to any plausible agency interpretation. *Id.*[2] Applying the *Chevron* test to the case at hand, this Court finds Congress has not addressed the select group policy (*Chevron* step 1). However, the policy appears a reasonable one entitled to deference (under *Chevron* step 2).

### CHEVRON STEP 1: Congressional Intent

In determining whether Congress has clearly addressed a legal issue, the Court must decide if the statute at issue has a plain meaning. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82. To do this, the Court should consult relevant sources including (1) the statutory language and (2) the legislative history. *Id.* at 862–65, 104 S.Ct. at 2791–93.

***Statutory language.*** The FCUA's common bond provision states, "Federal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district." 12 U.S.C. § 1759. Both Plaintiffs and Defendants argue that this language supports their respective positions.

Plaintiffs assert that the singular phrase, "a common bond", requires a single common bond exist among all members of each credit union. Defendants counter that the statutory language authorizes the inclusion of more than one group of membership in a single credit union because the singular term "credit union" is limited to "groups" having a common bond. Defendant NCUA additionally claims that the phrase "having a common

---

1. NCUA reaffirmed this policy without significant change in 1984, 1989 and 1994.

2. The Sixth Circuit has endorsed the *Chevron* standard. *See, e.g., Nationwide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1356 (6th Cir.1995); *Garcia v. Secretary of Health and Human Ser-*

vices, 46 F.3d 552, 555 (6th Cir.1995); *Rowland v. U.S. Dept. of Agriculture,* 43 F.3d 1112, 1116 (6th Cir.1995); *Sharondale Corp. v. Ross,* 42 F.3d 993, 998 (6th Cir.1994); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1349–51 (6th Cir.1994).

bond" contains no connotation of mutual possession of characteristics among all groups, as would a phrase such as "sharing a common bond."

■ Both Plaintiffs' and Defendants' readings of the common bond provision are plausible. When an agency's interpretation is one of two plausible alternatives, the statute is ambiguous. 467 U.S. at 842–44, 104 S.Ct. at 2781–82. Thus, the Court cannot discern Congress' precise intent of the common bond provision from the statutory language alone.[3]

*Legislative history.* The legislative history concerning the common bond requirement is quite meager. When Congress debated the FCUA, it did not explain the common bond provision in any detail. General Accounting Office, *Credit Unions: Reforms for Ensuring Future Soundness* 217 (1991) ("GAO Report").[4] Both Plaintiffs and Defendants cite only isolated portions of the record that they claim support their respective arguments.

In support of their position, Plaintiffs first point to a 1934 Senate Report that describes credit unions as "limited in each case to the members of *a specific group* with *a common bond* of occupation or association." S.Rep. No. 555, 73d Cong., 2d Sess. 2 (1934) (emphasis added). Plaintiffs also rely on a statement by Mr. Bergengren during the Senate

Banking Committee hearings that "every credit union is organized within a limited and given *group* of people." *Credit Unions: Hearings on S. 1639, S. 1640 and S. 1641 before a Sub–Comm. of the Senate Comm. on Banking and Currency,* 73d Cong., 1st Sess. 31 (1933) (emphasis added). Plaintiffs claim these sources indicate Congress intended a single common bond exist among all members of each credit union. Both the Senate Report and Mr. Bergengren's remark, however, were apparently only explaining credit unions as they existed in the early 1930's. They were mere descriptions rather than exhaustive statements meant to define the outer contours of credit union membership.[5]

Defendants, in support of their position, rely on a House Report indicating that "membership in Federal credit unions is limited to *groups* having *common bonds* of occupation or association or to groups within well defined communities." H.R.Rep. No. 2021, 73d Cong., 2d Sess. 3 (1934) (emphasis added). Defendants claim this plural reference to "groups" having "common bonds" demonstrates Congress intended to permit multiple groups to join a single credit union. However, the report's language is too vague to support such a proposition. The statement could have merely meant that credit unions *collectively* have groups with common bonds.[6]

3. Plaintiffs imply that reading the statutory language of the common bond provision to allow multiple groups to join a single credit union would permit the limitless growth of federal credit unions. There are, however, limits to credit union membership. Each occupational group in a credit union must "be employed by the same enterprise" or belong to the same association that has "common loyalties" and holds yearly meetings. 54 Fed.Reg. 31169. Other limits on the expansion of credit unions also exist. *See, e.g.,* 54 Fed.Reg. 31176.

4. *See also NCUA Studies in Federal Credit Union Chartering Policy* 12 (1979) ("There is very little in the legislative history that can be characterized as a[n] insightful, analytic discussion of the essence of the [common bond] phrase, and of its intended scope and application"). Note that although this report was prepared by defendant NCUA, it predates the interpretive change at issue in this case by three years.

5. Plaintiffs also point to a statement made by Congressman Stegall, Chairman of the House Banking Committee, during the original passage of the FCUA that, "The system loans on charac-

ter, a thing greatly to be desired." 78 Cong.Rec. 12, 223 (1934). Plaintiffs assert that the enforcement of a single common bond requirement is the only measure that would insure sufficient unity of membership within credit unions to make loans based on character possible. However, while a single common bond among all members in each credit union might encourage loans based on character, NCUA's select group policy does not prevent credit unions from loaning on character. Plaintiffs overstate the value of a single common bond requirement by claiming it is the *only* way credit unions will be able to consider character when making loans.

6. Defendants also claim the following conversation made by Congressmen debating the FCUA supports their position:

Mr. Knutson: Will this legislation take care of small business men who have one or two clerks?

Mr. Luce: I have no reason to believe that they cannot join the union and profit thereby. 78 Cong.Rec. 12218, 12225 (1934).

The precise meaning of Congressman Luce's statement, however, is unclear. It could simply

Defendant NCUA additionally points to congressional inaction many years after the FCUA's passage that they claim demonstrates Congress has addressed and approved the select group policy. In 1970, Congress mandated that NCUA "provide more flexible and innovative regulation" in the face of changing economic conditions. S.Rep. No. 91–518, 91st Cong., 2d Sess. (1970) U.S.Code Cong. & Admin.News 1970, pp. 2479, 2481. In accord with this mandate, NCUA liberalized its interpretation of the common bond provision several times prior to adopting the select group policy. Congress did not object to any of these revisions or to the crucial 1982 revision. Although NCUA, lobbyists from the banking industry and the GAO repeatedly informed Congress of NCUA's select group policy, Congress failed to alter the common bond provision in the ten times it amended the FCUA since becoming aware of the select group policy. These facts, asserts NCUA, prove Congress intended to allow multiple groups to join a single credit union.

However, examining postenactment history of a statute to determine precise legislative intent is problematic. "Subsequent legislative history", as several courts have noted, is an oxymoron. *See, e.g., Pierce v. Underwood*, 487 U.S. 552, 566–68, 108 S.Ct. 2541, 2550–51, 101 L.Ed.2d 490 (1988); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974); *Continental Can Co. v. Chicago Truck Drivers*, 916 F.2d 1154 (7th Cir.1990). The hazards inherent in examining legislative history generally [7] are exacerbated when the views of a subsequent Congress are imputed to an earlier Congress that enacted a given statute. *See, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102,

117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980). Although the Supreme Court has not consistently rejected arguments relying on subsequent congressional action to define statutory terms, the Court most recently asserted that, as a general matter, failed legislative proposals and other congressional inaction lack "persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *Central Bank v. First Inter. Bank*, —— U.S. ——, —————, 114 S.Ct. 1439, 1453, 128 L.Ed.2d 119, 138–39 (1994). In the instant case, attributing inaction by recent Congresses to the Congress that enacted the FCUA would be especially inappropriate, given the great lapse of almost fifty years between the enactment of the FCUA and NCUA's subsequent select group interpretation. Thus, this Court finds Congress expressed no intent on whether multiple groups with common bonds could join a single credit union. Because the statutory language and contemporaneous legislative history do not support a finding that Congress had an intent on the select group policy when it enacted the FCUA, the Court must move to step two of the *Chevron* analysis.

## CHEVRON STEP 2: Reasonableness of NCUA's Interpretation

Because Congress did not directly address the select group policy, the next inquiry becomes whether NCUA reasonably interpreted the common bond provision when it established this policy. To determine the reasonableness of NCUA's construction, the Court should examine the policy and goals of the FCUA. *See Chevron*, 467 U.S. at 864–65, 104 S.Ct. at 2792–93.[8]

mean that employees of small businesses could join regionally defined credit unions rather than occupationally based ones.

**7.** Critics say that legislative history is written by staffers rather than Congress itself; that it is easily manipulated; that it complicates the tasks of execution and obedience; and that it often is shaped by members of Congress who cannot achieve passage of a desired interpretation in the actual text of an enacted statute. *See, Matter of Sinclair*, 870 F.2d 1340, 1342–44 (7th Cir.1989); *See also*, Stephen Breyer, *On the Uses of Legisla-*

*tive History in Interpreting Statutes*, 65 S.Cal. L.Rev. 845, 845–47 (1991) (describing various attacks on legislative history, but defending its use when judges are faced with unclear statutory language).

**8.** Plaintiffs assert that NCUA's select group policy is an unreasonable interpretation of the FCUA merely because the policy represents a departure from NCUA's pre–1982 interpretation of the common bond provision. An agency may, however, in light of changed circumstances, alter its interpretive policy views, so long as the altered

■ Viewing the FCUA in its entirety reveals Congress intended to promote the creation and growth of a stable national credit union system. For example, the Senate Committee on Banking and Currency stated the FCUA was designed to eliminate impediments retarding the growth of credit unions. S.Rep. No. 555, 73d Cong., 2d Sess. 2 (1934). The Committee also stated the FCUA would help establish a national system of cooperative credit for the "masses of people" whose buying power was dissipated by the Depression. *Id.* at 2–4. Floor comments also show Congress' intent to promote the extensive growth of credit unions. For example, Congressman Sheppard recognized "the general merit of credit unions, their extraordinary record during the depression, and the value of rapid credit-union extension." 78 Cong. Rec. 7259 (1934). Thus, the legislative history supports the view that Congress intended the FCUA to promote credit union expansion and stability.

NCUA's change to its select group policy was entirely consistent with these congressional goals of promoting the continued growth and stability of credit unions. In the years following passage of the FCUA, both Congress and the NCUA viewed a narrow interpretation of the common bond requirement as necessary to effectuate the purpose of insuring financial stability. GAO Report at 215–19. Drastic economic changes over the years, however, necessitated changes in the common bond interpretation. By the late 1960's, credit unions faced increasing challenges as commercial banks and other financial institutions began aggressively competing for new customers. *Id.* at 227–28. With the rising interest rates and spiraling inflation of the 1970's, competition for customers increased as consumers sought the best returns on savings and the lowest interest rates on loans. *Id.* By the recessionary period of 1980–82, credit union loans had declined for the first time since World War II, and the number of credit unions in existence was also declining. A. Burger & T. Dacin, *Field of Membership: An Evolving Concept,* Center for Credit Union Research, University of Wisconsin–Madison School of Business, at 30, 36 (2d ed. 1992) ("Burger & Dacin"). Against this volatile economic backdrop, NCUA implemented its select group policy to protect credit unions by allowing them to diversify against economic troubles that might befall the single common bond group of each credit union. Burger & Dacin at 38. The policy helped many credit unions to compete and survive. GAO Report at 3, 9. Had NCUA not implemented the select group policy, many credit unions might have collapsed. Thus, NCUA's select group policy was a reasonable interpretation of the common bond provision, given Congress' goals of promoting credit union growth and stability.[9] Therefore, because NCUA's select group policy is a reasonable interpretation of the common bond provision, the Court must give it deference.

### Conclusion

Congress did not address the precise issue of whether the FCUA's common bond provision permits multiple groups to join a single credit union as long as each group has a common bond among its members. Because Congress did not address this issue, the Court will defer to NCUA's reasonable select group interpretation. Because the select group policy is a legal interpretation of the common bond provision, NCUA properly relied on it in approving AEDC's amended

---

views are reasonable statutory constructions. *Rust v. Sullivan,* 500 U.S. 173, 186, 111 S.Ct. 1759, 1768–69, 114 L.Ed.2d 233 (1991); *Chevron,* 467 U.S. at 863–64, 104 S.Ct. at 2791–92.

9. As stated earlier, although NCUA, lobbyists from the banking industry and the GAO repeatedly informed Congress of NCUA's select group policy, Congress failed to alter the common bond provision in the ten times it amended the FCUA since becoming aware of the select policy. Such congressional inaction, while not necessarily indicative of Congress' precise intent in enacting the common bond provision, is at least some evidence of the reasonableness of the select group policy. *See, e.g., United States v. Riverside Homes, Inc.,* 474 U.S. 121, 137, 106 S.Ct. 455, 464, 88 L.Ed.2d 419 (1985); *Walls v. Waste Resources Corporation,* 823 F.2d 977, 980 (6th Cir.1987) (stating that while subsequent legislative history may not be dispositive as to congressional intent, it nonetheless provides useful guidance in determining statutory meaning in unsettled areas of law).

charters. Thus, the Court grants defendants' motions for summary judgment.

## ORDER

Plaintiffs have brought suit claiming the National Credit Union Administration incorrectly interpreted the "common bond" provision of the Federal Credit Union Act, giving the AEDC Federal Credit Union and other credit unions an unfair and illegal competitive advantage against banks. Both Plaintiffs and Defendants have moved for summary judgment. For reasons detailed in the accompanying Memorandum, this Court defers to NCUA's interpretation of the common bond provision. Plaintiffs' motion for summary judgment is denied, and Defendants' summary judgment motions are granted.

It is so ORDERED.