**FIRST CITY BANK, Plaintiff–Appellant,**

**Tennessee Bankers Association, Intervening Plaintiff–Appellant,**

v.

**NATIONAL CREDIT UNION ADMINISTRATION BOARD, Defendant–Appellee,**

**AEDC Federal Credit Union, Tennessee Credit Union League, and Credit Union National Association, Inc., Intervening Defendants–Appellees.**

No. 95–6543.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 15, 1996.

Decided April 14, 1997.

Rehearing Denied June 16, 1997.

Randall S. Mashburn (argued and briefed), Baker, Donelson, Bearman & Caldwell, Nashville, TN, Rodney M. Scott, Murfreesboro, TN, for Fiest City Bank, Tennessee Bankers Association.

Jacob M. Lewis (argued and briefed), Douglas N. Letter, Department of Justice, Appellate Staff, Civil Division, Washington, DC, Anne L. Weismann, Department of Justice, Washington, DC, for National Credit Union Administration Board.

William M. Leech, Jr., Michael R. Paslay, Waller, Lansden, Dortch & Davis, Nashville, TN, Teresa Burke (briefed), Paul J. Lambert, Bingham, Dana & Gould, Washington, DC, for Tennessee Credit Union League, Credit Union National Association, Inc.

Teresa Burke, (briefed), Paul J. Lambert, Bingham, Dana & Gould, Washington, DC, for AEDC Federal Credit Union.

Before: JONES, RYAN, and MOORE, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which MOORE, J., joined. JONES, J. (pp. 439–42), delivered a separate dissenting opinion.

### RYAN, Circuit Judge.

The plaintiff, First City Bank, filed this action under the Federal Credit Union Act (FCUA), 12 U.S.C. §§ 1751–1795k, the Administrative Procedure Act, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, challenging the National Credit Union Administration's (NCUA) interpretation of the FCUA. The Tennessee Bankers Association subsequently intervened as a plaintiff, and the AEDC Federal Credit Union, the Tennessee Credit Union League, and the Credit Union National Association intervened as defendants. The district court granted summary judgment for the defendants and intervenor-defendants, and the plaintiffs appeal arguing that the district court erred in concluding that the NCUA reasonably interpreted the FCUA to allow multiple occupational groups, each of which independently shares a "common bond," to join a single credit union. As we shall explain, we agree that the district court erred, and will reverse.

### I.

### A.

First City is a Tennessee banking corporation, and a member of the Tennessee Bankers Association, the principal state trade association for commercial banks in Tennessee. Defendant NCUA is an executive branch government agency responsible for regulating federally insured credit unions. *See generally* 12 C.F.R. Ch. VII. It was established in 1970 to "prescrib[e] rules and regulations for the organization and operation of federal credit unions." National Credit Union Administration, Office of Examination and Insurance, Federal Credit Union Handbook 2 (1988). Defendant AEDC Federal Credit Union is a federally chartered credit union. Defendants Tennessee Credit Union League and Credit Union National Association are trade associations for credit unions in Tennessee and nationally, respectively.

Congress passed the FCUA, creating federal credit unions, in response to the failed banks, high interest rates, and diminished credit opportunities that were a hallmark of the Great Depression. *See T I Federal Credit Union v. DelBonis,* 72 F.3d 921, 931–32 (1st Cir.1995). The purpose of the FCUA was to "establish a Federal Credit Unions System, to establish a further market for

securities of the United States and to make more available to people of small means credit for provident purposes through a national system of cooperative credit, thereby helping to stabilize the credit structure of the United States." 12 U.S.C. § 1751, *reprinted in* CREDIT UNION NATIONAL ASSOCIATION, INC., LEGISLATIVE HISTORY OF THE FEDERAL CREDIT UNION ACT: A STUDY OF THE HISTORICAL DEVELOPMENT FROM 1934 TO 1980 OF THE STATUTE GOVERNING FEDERAL CREDIT UNIONS, *quoted in DelBonis,* 72 F.3d at 931. Thus, "[i]n effect, the Federal Credit Union Act created a localized and liberalized system of federal credit services," and FCUs

> enable the federal government to make credit available to millions of working class Americans. These organizations, often described as "cooperative association[s] organized ... for the purpose of promoting thrift among [their] members and creating a source of credit for provident or productive purposes," provide credit at reasonable rates to millions of individuals who— because they lack security or, as recent studies show, reside in low income areas or in communities primarily inhabited by racial minorities—would otherwise be unable to acquire it.

*DelBonis,* 72 F.3d at 931–32 (citation omitted). As *DelBonis* suggests, then, the purpose of the FCUA was "to encourage the proliferation of credit unions, which were expected to provide service to th[e] would-be customers that banks disdained." *First Nat'l Bank & Trust Co. v. National Credit Union Admin.,* 988 F.2d 1272, 1275 (D.C.Cir. 1993) (*FNBT I* ).

Under the FCUA, a federal credit union, or FCU, is owned and controlled by its members. 12 U.S.C. § 1757(6). An FCU can only make loans to and accept deposits from its own members and other credit unions. *Id.* § 1757(5).

Section 109 of the FCUA provides in pertinent part that

> Federal credit union membership shall be limited to *groups having a common bond of occupation* or association, or to groups within a well-defined neighborhood, community, or rural district.

*Id.* § 1759 (emphasis added). The issue presented in this case involves only the "common bond" requirement for occupational credit unions, and does not involve associational or community credit unions.

One court has observed that

> Congress assumed implicitly that a common bond amongst members would ensure both that those making lending decisions would know more about applicants and that borrowers would be more reluctant to default.... The common bond was seen as the cement that united credit union members in a cooperative venture, and was, therefore, thought important to credit unions' continued success.

*FNBT I,* 988 F.2d at 1276. Another court has described the purpose of the common bond provision somewhat differently, emphasizing the need of members to elect directors who will represent their interests:

> The purpose of the common bond provision is evident from the nature of the institutions created by the Act. A credit union has been aptly described as "a democratically controlled, cooperative, nonprofit society organized for the purpose of encouraging thrift and self-reliance among its members.... [It] is fundamentally distinguishable from other financial institutions in that the customers may exercise effective control." The union's purposes are threatened by directors that are unmindful of members' funds or unresponsive to their collective interests. Thus Congress ensured that federal credit unions would retain their character as self-managed cooperatives by establishing democratic principles of decision and control. The common bond provision reinforces this aim by advancing the formation of credit unions among groups that may realistically operate with unity of purpose. It encourages the election of directors who possess a common interest or occupation with the membership they serve.

*Branch Bank & Trust Co. v. National Credit Union Admin. Bd.,* 786 F.2d 621, 626 (4th Cir.1986) (citation omitted).

"From 1934 until 1982 the NCUA interpreted the common bond requirement to mean that the members of each occupational

FCU ... must be drawn from a single occupational group, defined to mean the employees of a single employer." *First Nat'l Bank & Trust Co. v. National Credit Union Admin.,* 90 F.3d 525, 526 (D.C.Cir.1996) (*FNBT II* ) (citing 58 Fed.Reg. 40473 (July 28, 1993)), *cert. granted,* —— U.S. ——, 117 S.Ct. 1079, 137 L.Ed.2d 215 (1997). However, the NCUA had been tinkering with the common-bond requirement since 1967, gradually and consistently broadening the definition of the term. Finally, in 1982, the NCUA departed from its prior interpretation of the "common bond" language, and adopted a policy statement allowing multiple, or select, groups, each of which independently shared a common bond, to join together to form a credit union, so long as all the occupational groups "are located within a well defined area." Interpretative [sic] Ruling and Policy Statement (IRPS) 82–1, 47 Fed.Reg. 16775 (Apr. 20, 1982). The NCUA stated that its purpose for the change was to "clarify NCUA's policy on membership in Federal credit unions, ... and to ensure the continued availability of credit union service." *Id.* Other available information suggests that

> [t]he 1982 change of interpretation was intended to enable each FCU to realize economies of scale and to facilitate occupational diversification within the ranks of its membership.... The new policy also made it possible for the employees of a company with fewer than 500 employees, the minimum for forming a new FCU, to join an existing FCU.

*FNBT II,* 90 F.3d at 526–27 (citing Letter from E.F. Callahan, Chairman of the NCUA, to Congressman Fernand J. St. Germain, Chairman of the House Committee on Banking, Finance and Urban Affairs 8–9 (Oct. 28, 1983); IRPS 89–1, 54 Fed.Reg. 31165, 31171 (July 27, 1989)). The NCUA has continued to reiterate this position on the common-bond requirement, doing so most recently in 1994. *See* IRPS 89–1, 54 Fed.Reg. 31165 (July 27, 1989).

### B.

First City originally filed suit against the NCUA in April 1994, seeking an order that the NCUA cease and desist from its current interpretation of the common-bond requirement. A credit union and two credit union trade associations—the AEDC Federal Credit Union, the Tennessee Credit Union League, and the Credit Union National Association, respectively—moved to intervene as defendants, and the Tennessee Bankers Association moved to intervene as a plaintiff. Both motions were granted. The plaintiffs then amended their complaint to include a request for invalidation of charter amendments expanding the membership base of AEDC, which amendments had been approved by the NCUA.

The parties filed cross-motions for summary judgment, and the district court ruled in favor of the defendants. *First City Bank v. National Credit Union Admin.,* 897 F.Supp. 1042 (M.D.Tenn.1995). The court reasoned that "[t]he sole issue is the purely legal question of whether NCUA's select group policy is a valid interpretation of the FCUA's common bond provision," and concluded that its analysis was governed by the *Chevron* doctrine. *Id.* at 1043 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). The court concluded that both parties' "readings of the common bond provision are plausible. When an agency's interpretation is one of two plausible alternatives, the statute is ambiguous. Thus, the Court cannot discern Congress' precise intent of the common bond provision from the statutory language alone." *Id.* at 1044 (citation omitted). It also concluded that the legislative history was meager, and "expressed no intent on whether multiple groups with common bonds could join a single credit union." *Id.* at 1045. It nonetheless concluded that "NCUA's change to its select group policy was entirely consistent with the[ ] congressional goals of promoting the continued growth and stability of credit unions," and that the policy was justified because without it, many credit unions would not have survived. *Id.* at 1046.

The plaintiffs filed this timely appeal.

### II.

Our review of the district court's grant of summary judgment, which was

premised on a question of statutory construction, is *de novo*. *See Douglas v. Babcock,* 990 F.2d 875, 877 (6th Cir.1993). The same rules of review apply where, as here, the parties have filed cross-motions for summary judgment. *See Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991).

### III.

█ Our analysis hinges on an application of the administrative-law doctrine announced by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron,* the Court explained as follows:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. *First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.* If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (emphasis added) (footnotes omitted). Step one of a *Chevron* analysis, then, is an inquiry whether the statute dictates a particular answer, while in step two, a court may proceed to considering the permissibility of the agency construction.

The plaintiffs contend that the issue may be resolved at *Chevron* step one because the FCUA statutory language is clear and unambiguous. The NCUA, on the other hand, argues that its reading of the FCUA must be upheld because it reasonably resolves an issue as to which the intent of Congress has not been clearly expressed, either by the plain language of the statute or in the legisla-

tive history; that is, it believes that a *Chevron* step two analysis is required, and that its interpretation is owed deference by this court. Like the NCUA, the credit-union-intervenors believe that a *Chevron* step two analysis is necessitated because there is no basis for concluding that Congress had any intention with respect to the issue in this case. While contending that the literal language of the statute supports the NCUA's interpretation, they also argue that even if the plaintiffs' interpretation is plausible, that simply demonstrates that the statute is ambiguous, and the agency's interpretation is owed deference.

To reiterate, the statutory language in question is the following:

> Federal credit union membership shall be limited to *groups having a common bond of occupation or association,* or to groups within a well-defined neighborhood, community, or rural district.

12 U.S.C. § 1759 (emphasis added). The leading case, indeed the only court of appeals case, addressing the issue presented to this court, was decided only recently by the D.C. Circuit. *See FNBT II,* 90 F.3d 525. The D.C. Circuit concluded, under a *Chevron* step one analysis, that the statutory language and purpose were plain, and that the NCUA's interpretation of the statute stood in direct contradiction. We agree.

The parties offer various syntactical arguments in support of their positions. The plaintiffs argue that the statutory language is plain, since it requires every credit union to have "*a* common bond," which they read to mean a *single* common bond. The NCUA counters first by arguing that because the statute includes the word "groups," its multiple group policy constitutes a reasonable read; second by observing that the statute says "Federal credit union membership," as opposed to "membership in Federal credit unions," suggesting that the reference to plural "group*s* " was meant to be within a single credit union, not multiple credit unions; and third by pointing out that the statute does not say that the groups must "share" a common bond, a word that it contends denotes mutuality, but only that the groups must

"have" a common bond, suggesting that each group can separately have a common bond.

The *FNBT II* court considered and rejected similar, if not identical, arguments:

> [The plaintiff] contends, first, that the article "a" in the phrase "groups having a common bond" means that all members of an FCU must be united by a single occupation. The NCUA counters that the plural noun "groups" in the same phrase indicates that there may be multiple groups in an FCU, so that the statute makes sense only if it is understood to contemplate multiple bonds, each uniting a single group even if the same bond does not unite all groups, *i.e.,* the membership as a whole.

*Id.* at 527–28. Like the *FNBT II* court, we find all the parties' syntactical arguments to be unconvincing. *Id.* at 528. "The article 'a' could as easily mean one bond for each group as one bond for all groups in an FCU, and the plural noun 'groups' could refer not to multiple groups in a single FCU but to each of the groups that forms a credit union under the FCUA." *Id.*

■ The plaintiffs offer another basis for their position, however, and we find it far more persuasive. They argue that because the occupational clause ("limited to groups having *a* common bond of occupation") is followed directly by the community clause ("groups within *a* well-defined neighborhood, community, or rural district"), and because the two share the same syntactical structure, the two ought to be interpreted consistently. Therefore, since the NCUA only permits community-based credit unions to be based on membership in a single group from a single neighborhood, as opposed to multiple neighborhoods, the agency should apply the same interpretation to the occupation-based credit unions. The NCUA addresses this argument by asserting that the word "within" makes the difference; the statute states that a credit union must be composed of "groups *within* a well-defined neighborhood," and it is the word "within" that necessitates the NCUA's policy that membership may not consist of groups from widely dispersed locales. The credit-union-intervenors, on the other hand, address the plaintiffs' "community" argument in an interesting way that the

NCUA has not espoused: they contend that just because the NCUA has always interpreted the phrase to require membership from a single community does not mean that it *could not* employ a different interpretation, allowing multiple community groups to join together in a single credit union. The current interpretation, they reason, reflects a policy choice, not a statutory imperative.

■ The *FNBT II* court was presented with largely the same arguments, and sided with the analysis advanced by the plaintiffs here:

> [T]he term "groups" in the two parallel provisions of § 109 [of the FCUA]—permitting credit unions composed either of (1) "groups having a common bond of occupation" among all the members or of (2) "groups within a well-defined neighborhood, community, or rural district"—must be interpreted in a consistent way. If the so-called community provision were construed in a manner consistent with the NCUA's revised interpretation of the occupational provision, then a single FCU could include residents of any number of "well-defined neighborhood[s], communit[ies], or rural district[s]" around the country. Yet this expansive construction has never been advocated by the NCUA; on the contrary, the NCUA regulation implementing the community provision expressly requires that all FCU members live, worship, or work in "a single, geographically well-defined area."

*Id.* at 528–29 (citation omitted). We agree. It is a basic canon of statutory construction that phrases within a single statutory section be accorded a consistent meaning. The only reasonable way to read these two phrases, one following on the heels of the other, is as the *FNBT II* court does. We simply reject the NCUA's focus on the word "within" as a distinguishing factor. And while we note the credit-union-intervenors' argument that the NCUA could, if it chose, interpret the community provision more broadly, we note too and we think it is significant that the NCUA itself does not make any such claim.

Finally, and perhaps most importantly, if the NCUA's interpretation is accepted, it

would make the common-bond requirement meaningless. If credit unions are permitted to join together an infinite number of distinct groups, so long as each group has within it a common bond, it makes no sense to have the common-bond requirement at all; essentially, the NCUA's interpretation would allow the joining together of many groups with completely diverse constituencies, basically obliterating any overall common bond. While we do not pretend to know the rationale behind the common-bond requirement—there being various possible explanations in a legislative history that all parties agree is ambiguous and unhelpful—we simply cannot conceive, and no one has suggested, any statutory rationale for requiring the type of "common bond" the NCUA has invoked.

## IV.

Accordingly, we **REVERSE** the district court's judgment, and remand the case for further proceedings. On remand, the district court should address the credit-union-intervenors' argument that the plaintiffs' suit is barred by a six-year statute of limitations, a factually intensive claim that this court is ill-equipped to consider in the first instance.

JONES, Circuit Judge, dissenting.

This case involves the interpretation of the Federal Credit Union Act, a statute administered by the National Credit Union Administration ("NCUA"). I believe that the text of the common bond provision is ambiguous and that the district court properly determined that the National Credit Union Administration's ("NCUA") interpretation of the common bond provision is reasonable. Because I believe that this case must be examined under both prongs of the doctrine articulated in *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), I must respectfully dissent from the majority's opinion reversing the judgment of the district court. Instead, I would affirm the judgment of the district court.

The *Chevron* decision requires that courts undertake a two-step process in reviewing an agency's interpretation of a statute that it is entrusted to administer. The first step is to determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. If Congress has clearly addressed the issue, courts must "give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. If the court determines that Congress has not "directly addressed the precise question at issue," the court must then reach the second prong of the *Chevron* test and determine the reasonableness of the agency's interpretation of the statute. *Id.* This court has adopted the *Chevron* standard. *See e.g., Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1356 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 973, 133 L.Ed.2d 893 (1996); *Garcia v. Secretary of Health and Human Services*, 46 F.3d 552, 555 (6th Cir.1995).

In the case at bar, the statutory provision at issue is ambiguous. The statute provides: "[f]ederal credit union membership shall be limited to groups having *a common bond of occupation or association.*" 12 U.S.C. § 1759 (emphasis added). In determining whether Congress has addressed the common bond requirement, this court should look to the plain meaning of the statute and the legislative history. *See Chevron*, 467 U.S. at 859–63, 104 S.Ct. at 2790–92. Neither of these sources expresses the clear intent of Congress concerning the common bond provision.

Unlike the majority in this case and the D.C. Circuit in *First Nat'l Bank & Trust Co. v. National Credit Union Administration*, 90 F.3d 525 (D.C.Cir.1996), *cert. granted*, —— U.S. ——, 117 S.Ct. 1079, 137 L.Ed.2d 215 (1997). I do not believe that the words of the statute clearly and unambiguously define the common bond requirement. The majority rejects the syntactical arguments raised by both parties and bases its decision on the relationship between the occupational clause and the community clause. Maj.Op. at 438. The majority concludes that because the two clauses have a similar syntactical structure, the "two ought to be interpreted consistently." *Id.* This is not clear from the words of the statute.

Although the majority contends that this is a *Chevron* step 1 case, the majority, never-

theless, utilizes a *Chevron* step 2 analysis. The majority's argument that the terms of the occupational and community-based clauses should be interpreted consistently goes to the reasonableness of the NCUA's interpretation of the statute rather than to a consideration of whether the words of the statute are clear on their face. In fact, the majority notes that "[t]he only reasonable way to read these two phrases, one following on the heels of the other, is as the *FNBT II* court does." Maj.Op. at 438. This is a *Chevron* step 2 analysis determining whether the NCUA's interpretation of the statute is reasonable. This syntactical argument does not support the position that the words of the common bond provision are clear on their face.

The common bond provision can be read one of two ways. Either the provision requires that each group in a credit union have a bond with the other groups in the credit union, or the provision requires that each group joining a credit union have a common bond among the members of the group, but not necessarily a common bond with the other groups in the credit union. The statute does not clearly establish the unambiguous congressional intent concerning the common bond requirement and determine which reading of the statute is appropriate. I agree with the district court's conclusion that "[w]hen an agency's interpretation is one of two plausible alternatives, the statute is ambiguous." *First City Bank v. National Credit Union Admin.,* 897 F.Supp. 1042, 1044 (M.D.Tenn.1995).

The language of the statute simply indicates that credit unions are to be formed based on common bonds of occupation or community. The words of the statute do not go so far as to define the limits of the common bond requirement. I believe that the majority's conclusion that the terms of the common bond provision and the community provision must be interpreted in exactly the same way is reading more into the statute than the actual words suggest. The statute does not define the contours of the common bond requirement and offers no clear answer to the question at bar. As a result, we must conclude that Congress has not

"directly spoken to the precise question at issue."

In addition, the legislative history of the common bond requirement does not clarify the ambiguity in the words of the statute. I agree with the majority that the legislative history of the common bond requirement is murky at best and does not demonstrate a clear intention concerning the common bond provision.

This court has previously recognized that the NCUA is given the authority to regulate credit union membership. *Community First Bank v. National Credit Union Administration,* 41 F.3d 1050, 1055 (6th Cir.1994). In *Community First Bank,* this court examined the regulations promulgated by the NCUA concerning community-based credit unions and concluded that the NCUA's regulations constituted a permissible interpretation of the word "community." *Id.* While this court did not explicitly conduct a *Chevron* inquiry, it appears that the court concluded that the words of the statute were ambiguous because it engaged in a determination of whether the NCUA's interpretation of the word "community" was reasonable, the second prong of *Chevron. Id.* ("The NCUA's regulations defining 'community' (a clearly defined geographical area whose residents identify it as a distinct area) constitute a permissible definition of community."). I believe that a similar inquiry is necessary in this case, as we must decide whether the NCUA's interpretation of the common bond provision is reasonable.

Neither the words nor the legislative history of the common bond provision clearly evidence the intent of Congress. Therefore, it is necessary to determine whether the NCUA's interpretation of the common bond provision is reasonable. The interpretation of the common bond provision is embodied in an interpretive ruling rather than a regulation promulgated by the NCUA. An interpretive ruling is not entitled to the same amount of deference as given to a regulation. *Threlkeld v. Commissioner,* 848 F.2d 81, 84 (6th Cir.1988). However, this does not mean that interpretive rulings are not entitled to any deference at all. In *CenTra, Inc. v. United States,* this court noted that an IRS

revenue ruling is "entitled to some deference unless 'it conflicts with the statute it supposedly interprets or with that statute's legislative history or if it is otherwise unreasonable.'" 953 F.2d 1051, 1056 (6th Cir.1992) (quoting *Threlkeld*, 848 F.2d at 84). The standard of "some deference" enunciated in *CenTra* is applicable to the NCUA interpretive ruling at issue in this case. While the NCUA's interpretive ruling is not entitled to presumptive deference, because it is an interpretive ruling rather than a regulation, it is, nevertheless, entitled to "some deference."

It is a clearly established legal principle that courts accord deference to an agency's interpretation of a statute that it is entrusted to administer. *See Chevron*, 467 U.S. at 842–45, 104 S.Ct. at 2781–83 (giving deference to the Environmental Protection Agency's interpretation of the Clear Air Act Amendments); *Smiley v. Citibank (South Dakota), N.A.*, —— U.S. ——, ——, 116 S.Ct. 1730, 1733, 135 L.Ed.2d 25 (1996) (giving deference to the regulations of the Comptroller of the Currency); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1355 (6th Cir.1994) (giving deference to the Secretary of Agriculture's amendments to the Agricultural Marketing Agreement Act of 1937), *cert. denied*, —— U.S. ——, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995). This deference is required even if the court would have reached a different conclusion than the administrative agency. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11 (citations omitted). Thus, this court cannot strike down the NCUA's interpretation of the common bond provision because it would have interpreted the clause differently; instead, we must give deference to the NCUA's interpretation as long as it is reasonable.

To determine the reasonableness of the NCUA's common bond policy, we must examine the policy within the context of the Federal Credit Union Act as a whole. *Chevron*, 467 U.S. at 864–65, 104 S.Ct. at 2792–93.

The purpose of the Federal Credit Union Act as set forth in 1934 at the time of its enactment was to:

> establish a Federal Credit Union System, to establish a further market for securities of the United States and to make more available to people of small means credit for provident purposes through a national system of cooperative credit, thereby helping to stabilize the credit structure of the United States.

Federal Credit Union Act, Pub.L. 73–467, 48 Stat. 1216 (1934) (codified with some differences in language at 12 U.S.C. §§ 1751–1795). It is helpful to trace the socio-economic background of the credit union movement when looking to the reasonableness of the NCUA's interpretation of the common bond provision.

Credit unions experienced steady growth from the enactment of the Federal Credit Union Act in 1934 until the 1970's. At the end of the 1970's credit unions were hit with the impact of rising interest rates, which affected the entire financial services industry. A. Burger & T. Dacin, *Field of Membership: An Evolving Concept*, Center for Credit Union Research, University of Wisconsin–Madison School of Business, at 25 (2d ed. 1992). The rise in interest rates increased the competition for customers between banks and credit unions.

In 1979, the rate of growth was slowed at all financial institutions but credit unions were especially hard hit. *Id.* at 27. In the period of 1978–79, credit unions had changed from being the fastest growing financial institution in 1978 to the second slowest growing financial institution in 1979. *Id.* As a result of these economic considerations, many credit unions limited their consumer lending. *Id.* In 1981, an economic recession developed, which continued into 1982. *Id.* at 29.

The 1982 adjustment to the common bond policy was a response to the volatile economic conditions of the late 1970's and early 1980's. The revision of the common bond interpretation allowed groups to join existing credit unions if they did not have the number of members to make an individual credit union economically feasible. The revision protected against two potential problems.

First, it allowed credit unions to shield themselves from the economic consequences of wide-spread layoffs or plant closings of a particular employer. Second, it allowed credit unions to create economies of scale to provide services to its members in the most cost effective manner available. Without the more expansive interpretation of the common bond provision many credit unions would have failed, and many other groups would not have been able to attain credit union services. These effects would have been clearly inconsistent with the Congressional intent to make credit available to those with limited means.

The NCUA is entrusted with the administration of federal credit unions. 12 U.S.C. § 1766(a). It is authorized to charter, examine, and prescribe rules and regulations for the administration of the Federal Credit Union Act. *Id.* In Interpretive Ruling and Policy Statement 82–1, the NCUA permitted occupational credit unions to accept members of different occupational groups as long as the following guidelines are met:

1) The occupational groups to be included (new charter) or added (amendment, merger, conversion) have specifically requested credit union service. 2) The applicant demonstrates that credit union service can be provided and that each group wishes to be served by the applicant. 3) All the occupational groups to be included (new charter) or added (amendment, merger, conversion) are located within a well defined area. 4) The applicant has adequately supported the proposal as economically feasible and advisable.

47 Fed.Reg. 16775 (1982). In addition, the NCUA Interpretive Ruling and Policy Statement 89–1 states:

[a] select group of persons seeking credit union service from an occupational, associational or multiple group Federal credit union must have its own common bond. The select groups themselves may be either employee (occupational) groups or associational groups. However, a select group for expansion purposes cannot be defined by a common bond of community. The group's common bond need not be similar to the common bond(s) of the existing Federal credit union.

54 Fed.Reg. 31165, 31176 (1989). Each of these rulings was intended to clarify the interpretation of Sections 107(14) and 109 of the Federal Credit Union Act. 47 Fed.Reg. 16775, 16775 (1982); 54 Fed.Reg. 31165, 31165 (1989).

The common bond approach adopted by the NCUA is a reasonable policy choice in light of the economic circumstances discussed above. Therefore, it is entitled to deference by this court.

Finally, it is immaterial that the NCUA interpreted the common bond provision in the manner that the majority suggests from 1934 until 1982. The Supreme Court has noted:

[o]f course the mere fact that an agency interpretation contradicts a prior agency position is not fatal. Sudden and unexplained change ... may be "arbitrary, capricious [or] an abuse of discretion...." But if these pitfalls are avoided, change is not invalidating, since the whole point of Chevron is to leave the discretion provided by the ambiguities of a statute with the implementing agency.

*Smiley v. Citibank (South Dakota), N.A.*, ⸺ U.S. ⸺, ⸺, 116 S.Ct. 1730, 1734, 135 L.Ed.2d 25 (1996) (citations omitted). Similarly in *Rust v. Sullivan*, 500 U.S. 173, 186–87, 111 S.Ct. 1759, 1768–69, 114 L.Ed.2d 233 (1991), the Supreme Court rejected the idea that agency principles must last forever. The Court observed that agencies "must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" *Id.* (citation omitted). Agency policies are not etched in stone. An agency is permitted to change its policies to address continually changing circumstances. The NCUA's decision was not arbitrary or capricious nor was it an abuse of discretion. As a result, the change is not "invalidating."

We should **AFFIRM** the judgement of the district court determining that the NCUA's interpretation is reasonable under the two-step approach enunciated in *Chevron.*